[L.A. No. 31469. Jan. 24, 1983.]

RUDI A. UNTERTHINER, Plaintiff and Respondent, v.
DESERT HOSPITAL DISTRICT OF PALM SPRINGS,
Defendant and Appellant.

[redacted]

COUNSEL

Musick, Peeler & Garrett, Joseph A. Saunders and Jay D. Christensen for Defendant and Appellant.

A. Burrell Wiedeman and Constance R. Wiedeman for Plaintiff and Respondent.

OPINION

**BROUSSARD, J.**—Desert Hospital District of Palm Springs appeals from a judgment granting a petition for writ of mandate directing it to set aside its order denying Rudi A. Unterthiner, M.D., admission to its medical staff and directing it to admit him.

Dr. Unterthiner, a plastic and reconstructive surgeon, applied to Desert Hospital for medical staff membership and clinical privileges for more than 20 surgical procedures. Although almost all of his cosmetic surgery is performed in his office, access to hospital facilities is required for reconstructive surgery. The hospital sent inquiry letters to various hospitals and doctors. While most of the responses were extremely favorable, others were equally derogatory. After hearings, denial of his application was recommended successively by the credentials committee, the executive committee, the ad hoc committee, and a hearing officer appointed by the hospital's board of directors. The board adopted the hearing officer's recommendation.

The hearing officer determined that Dr. Unterthiner was untruthful in the preparation and filing of his application for staff membership, that he was untruthful in his testimony during the hearing, and that he failed to satisfy ethical standards.

The trial court first found that Dr. Unterthiner did not receive a fair hearing and that he was competent. The court entered an interim order that he be granted clinical privileges for a period of eight months to secure current information as to his ability and reliability. The court also ordered that depositions be taken from three doctors who had written very derogatory letters to the hospital but had not testified. The district appealed, and the Court of Appeal, in an unpublished opinion, reversed the order granting interim clinical privileges.

The trial court then determined that the denial of staff membership was not based on false answers but on derogatory comments of the three doctors, that their letters did not warrant denial of staff privileges, that Dr. Unterthiner did not receive a fair hearing and would not receive one if the matter were returned to the district, and that he was competent. The court concluded that he had been arbitrarily excluded from staff membership and ordered the district to admit him to membership.

After graduation from medical school at the University of Alberta, Dr. Unterthiner took his internship at the University of British Columbia, Vancouver Hospital. From 1968 to 1970 he served a two-year surgical residency at Santa Barbara General Hospital and Cottage Hospital, Santa Barbara. His contract was not renewed, and he completed his third year of surgical residency at Huntington Memorial Hospital in Pasadena. He went to the University of Cincinnati in 1971 where he worked for two years as a resident in plastic surgery. Following completion of the residency, he returned to Santa Barbara but shortly thereafter, in 1973, he began working in the Lancaster-Palmdale area, and continued there until moving to the Palm Springs area in 1976 and filing the instant application for staff membership.

There were favorable recommendations from doctors at each of the communities and hospitals where he served, and he also received derogatory comments from one or two doctors at each. While surgical abilities were questioned, the derogatory letters mainly challenged his veracity, avoidance of responsibilities, and his failure to comply with hospital rules. The most derogatory letter was from a surgeon who had been a fellow resident at Santa Barbara. He wrote that Dr. Unterthiner was a disgrace to the practice of medicine, was a pathological liar "unable to tell the truth about the minutest detail," consistently violated regulations concerning residents, avoided night calls, was unavailable for many hours at a time, and moonlighted at several hospitals against residency regulations. Other doctors reported that he was a liar and untrustworthy. One said he was known as the "phantom" at Santa Barbara because he was never available at assigned times, and his postoperative care was "most negligent." A surgeon at Huntington said that he learned Dr. Unterthiner claimed to be at the surgeon's office on occasions when he could

not be found for his general surgery duties and that when confronted, Dr. Unterthiner admitted he was lying.[1]

There was also evidence that, while a resident in Santa Barbara, Dr. Unterthiner, on a number of occasions scheduled for surgery, had failed to appear to scrub or had failed to appear timely. Other doctors or residents were called to assist. At the close of the hearing before the hearing officer, his request to personally address the hearing officer was granted, and when he sought to respond to the claimed failures to appear or timely appear, the hearing officer offered to reopen the hearing. Dr. Unterthiner did not deny but affirmed that he had failed to appear or appeared tardily. He sought to explain by stating that residents were paid only $400 per month, that to support his family he had taken a job with a Los Angeles hospital, and that on a number of occasions he was unable to return to Santa Barbara in time for scheduled surgeries. When counsel for the hospital interjected by stating that it was against the rules for residents to moonlight, he stated he was aware. He did not state whether he told his mentors or other surgeons that the reason that he had failed to appear was his Los Angeles job.

The application for membership on the medical staff states that any significant misstatements or omissions constitute cause for denial of appointment. Question 6, affiliations, requests the applicant to list all current and previous hospital affiliations, starting with the most current. Dr. Unterthiner failed to list Palmdale Community Hospital.

At the hearing before the hearing officer, Dr. Unterthiner acknowledged that he had conflicts with the chief of staff at Palmdale Community Hospital. The situation deteriorated to the point where Dr. Unterthiner said he tore up letters from the chief of staff without reading them. Due to chart problems his privileges were suspended at the hospital. He orally resigned from the hospital. The time sequence of the suspension, the practice of tearing up the letters, and the resignation is not shown by the record.[2] He testified that if charges or letters of suspension or revocation were sent to him, he would have torn them up without reading them.

Question 16 of the application asked whether his privileges at any hospital had ever been "suspended, diminished, revoked or not renewed" and whether

---

[1] These doctors did not testify at the hearings, and depositions were obtained from them while the first appeal was pending. The trial judge did not rely on the depositions. In their depositions, the three doctors reiterated their statements and amplified by providing details as to Dr. Unterthiner's asserted misconduct. One of the Santa Barbara doctors said that his "exotic" excuses became a regular subject of discussion and amusement in the doctors' lounge.

[2] The chief of staff was served with a subpoena and agreed to testify at the hearing before the hearing officer. However, he did not testify; a personal tragedy occurred precluding his appearance.

he had ever been denied membership or renewal thereof or been subject to disciplinary action "in any medical organization." He answered the question in the negative. He stated that the question called for listing any hospital where he had applied for privileges but had been denied them.

In 1973, he had applied to five hospitals in the Santa Barbara area. He was aware that none of the hospitals acted favorably on his requests. Notices of denial were mailed by Saint Francis Hospital of Santa Barbara and by Pinecrest Hospital, according to their records. Before the credentials committee he admitted that he had been denied membership. At that hearing he maintained that the omission of Saint Francis Hospital was due to his wife having filled out and signed his name to the application with him giving it only cursory review. At the ad hoc committee hearing and before the hearing officer he said he had not received the notices and did not know that his applications were rejected. When approval of his applications was delayed, he had learned from friends that there were going to be some problems. He then decided to locate his practice in the Lancaster-Palmdale area.

In response to the application's request for medical references, the application listed three doctors. One had not observed his clinical work, and another had not observed his plastic surgery work.

In response to a question at the ad hoc committee hearing whether he had any problems or clashes with individuals in the Lancaster-Palmdale area, he stated that he did not have "any specific problems" although he admitted that there were two doctors he did not like or did not get along with. He did not mention the conflicts with the chief of staff at Palmdale Community Hospital.

The chief of surgery at Antelope Valley Hospital, another hospital in the Lancaster-Palmdale area, testified to a number of events occurring there. Early in 1976, the surgical services committee reviewed orbital floor fractures, and reported several "conspicuous" differences between Dr. Unterthiner's cases and those of other doctors. A letter was sent specifying his average time from injury to surgery was 25 hours while the others' was greater than 50 hours. Of his eleven cases, three had normal laminagrams, four had no laminagrams at all, and one was equivocal. The history and physical findings fail to "reach conclusive evidence" that all the patients had orbital floor fractures. The surgery findings report herniated material removed in all cases but there was no indication of the material in the physical findings and clinical findings in all of the cases. The committee asked for a written response, and suggested he attend a meeting to discuss the matter.

Dr. Unterthiner replied by citing authorities to the effect that there is danger of further injury from late treatment and thus quick treatment is necessary and

that some studies had indicated that laminagraphy "rarely" was helpful in diagnosing the fractures. He assured the committee that in every case there were positive physical findings warranting the surgery. He did not claim that his notes reflected the findings. At the end of his letter Dr. Unterthiner objected to the highly critical attitude of the committee, asserting that it was violating a basic human right by presuming guilt and placing him in the position of continual defense. The chief of surgery responded that audits are carried on regularly and that there was no accusation made or intended. Apparently, the matter terminated without further proceedings.

A second incident at Antelope Valley Hospital arose after the application to Desert Hospital but before any of the hearings. Dr. Unterthiner and an office associate who had only temporary privileges performed facial surgery. A surgeon having temporary privileges was required to have another surgeon present who was to observe him during the entire operation, and a number of observed procedures were required for unrestricted privileges. A nurse reported that Dr. Unterthiner left after one side of the face was operated upon, leaving the associate to do the other side alone. According to the nurse, Dr. Unterthiner completed the patient's postoperative evaluation before the patient left the operating room, and the associate left telling a nurse to finish closing. The nurse also reported that the patient had been scheduled for Dr. Unterthiner but the associate was listed as surgeon on the surgical evaluation form. The chief of surgery commenced formal disciplinary proceedings, but Dr. Unterthiner, who had moved to Palm Springs, resigned his privileges and the disciplinary matter was not pursued. Dr. Unterthiner did not dispute any of the factual matters reported by the nurse but stated that he was aware that his associate was an experienced and able surgeon who was well qualified to finish the operation.

The chief of surgery related two additional incidents which occurred with respect to his patients after he had called Dr. Unterthiner to assist in their treatment. In the first involving a patient suffering a massive brain injury, Dr. Unterthiner was called in to close a laceration which did not go as deep as the bone, but on the chart Dr. Unterthiner set forth a major surgery. When the chief of surgery called the discrepancy to his attention, he responded by saying that in preparing the operative notes he must have confused patients. The chief of surgery acknowledged that this sometimes occurs when operative notes are not dictated immediately. In the second, Dr. Unterthiner was called to repair some superficial facial cuts of an accident victim and did an excellent job. But the operative notes reflected delicate nerve surgery and asserted that some very fine suture material was used. The chief of staff said that his examination did not reveal any nerve damage, and the hospital did not have facilities to permit use of such fine suture material. Dr. Unterthiner presented evidence of a method to use the fine suture material without special equipment, and also suggested that he might have brought specialized equipment from his office.

The chief of surgery said that some problems had come up as to Dr. Unterthiner's availability. He was not always available on the on-call schedule and there were some problems of failing to advise the emergency room when he was away and of having patients in the hospital without arranging for another doctor when he was away. However, the chief of surgery also stated that availability was a common problem and that Dr. Unterthiner was the only member of the staff with his specialty. He felt that this was not a "major" complaint, but that there was a "trend" and a number of physicians, but not all, were disgruntled. The chief of surgery also stated that while Dr. Unterthiner could do beautiful work, the things that bothered the doctors were that he could not be relied upon every time and could not be depended upon to take "really good care" of his postoperative patients. There were numerous occasions when the doctor could not be found to treat his patients in the hospital.

The chief of surgery was also asked whether Dr. Unterthiner would be admitted to the staff of Antelope Valley if he should reapply. The doctor replied that he might recommend Dr. Unterthiner but that, if he were readmitted, his work in the hospital would have to be closely monitored and that this would be a very expensive undertaking.

The third hospital in the Lancaster-Palmdale area, Lancaster Community Hospital, reported that Dr. Unterthiner had been on the active staff for three years, that he changed to the courtesy staff when he left the area and is currently on that staff, and that there was nothing derogatory in the hospital file. He received an excellent recommendation from the former chief of staff of that hospital. Dr. Unterthiner also has courtesy privileges at a Los Angeles hospital.

He provided an impressive number of endorsement letters from doctors urging his admission to the medical staff, including letters from some of his mentors at Santa Barbara, Pasadena and Cincinnati, and a large number of physicians practicing in those areas and in the Lancaster-Palmdale area. In addition, he claimed that most of the doctors providing derogatory material from Santa Barbara, Pasadena and Cincinnati were biased against him for personal reasons having no relation to his competency.[3] He said he had had little contact with the Santa Barbara and Pasadena doctors who wrote the derogatory letters.[4] Dr. Unterthiner submitted to a psychiatric examination, and the report was favorable to him.

---

[3]While this proceeding was pending before the hospital administration, Dr. Unterthiner was denied privileges at Eisenhower Medical Center. He did not appeal the denial or apply for privileges at the third hospital in the area.

[4]Counsel has suggested that Dr. Unterthiner was denied admission for competitive reasons, but it was shown that four of the five plastic surgeons recently applying to Desert Hospital were granted privileges.

## I. Standard of Review Applicable to Public Hospital Decisions Denying Surgical Privileges

█ Holding that the independent judgment rule rather than the substantial evidence rule was applicable to judicial review of decisions denying reappointment to a hospital medical staff, we distinguished the case of a doctor who had not previously been admitted in *Anton* v. *San Antonio Community Hosp.* (1977) 19 Cal.3d 802, 820-825 [140 Cal.Rptr. 442, 567 P.2d 1162]. (See *Lewin* v. *St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 383, fn. 12 [146 Cal.Rptr. 892].) We granted hearing in the instant case to reconsider whether the independent judgment rule should also be applicable to decisions denying initial applications for admission. For the following reasons, we have concluded that we should adhere to the prior cases.

Code of Civil Procedure section 1094.5 provides: "(a) Where the writ is issued for the purpose of inquiring into the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in the inferior tribunal, corporation, board or officer, the case shall be heard by the court sitting without a jury. . . .

"(b) The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any *prejudicial abuse of discretion. Abuse of discretion* is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or *the findings are not supported by the evidence.*

"(c) Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, *abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence; and in all other cases, abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record.*

"(d) Notwithstanding the provisions of subdivision (c), in cases arising from *private hospital boards,* abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record. . . ." (Italics added.)

█ In general, section 1094.5 leaves to the courts the establishment of standards to determine which cases require independent judgment review and which cases require substantial evidence review. (*Frink* v. *Prod* (1982) 31

Cal.3d 166, 174 [181 Cal.Rptr. 893, 643 P.2d 476]; *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 344 [156 Cal.Rptr. 1, 595 P.2d 579]; *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 140 [93 Cal.Rptr. 234, 481 P.2d 242].) In the former cases, an abuse of discretion is established if the trial court finds that the administrative findings are not supported by the weight of the evidence. In the latter, the trial court's inquiry is limited to a determination whether the findings are supported by substantial evidence in the light of the whole record. (*Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 44-45 [112 Cal.Rptr. 805, 520 P.2d 29].)

▆ "The courts must decide on a case-by-case basis whether an administrative decision or class of decisions substantially affects fundamental vested rights and thus requires independent judgment review. . . . In determining whether the right is fundamental the courts do not alone weigh the economic aspect of it, but the effect of it in human terms and the importance of it to the individual in the life situation. This approach finds its application in such an instance as the opportunity to continue the practice of one's trade or profession[12]—a right which induced this court's statement in 1939; 'it necessarily follows that the court to which the application for mandate is made to secure the restoration of a professional license must exercise an independent judgment on the facts. . . .' " (*Bixby* v. *Pierno, supra,* 4 Cal.3d 130, 144-145.)

*Bixby* also pointed out that "in determining whether the right is sufficiently basic and fundamental to justify independent judgment review, the courts have considered the degree to which the right is 'vested,' that is, already possessed by the individual. (*McDonough* v. *Goodcell, supra,* 13 Cal.2d 741, 753 [91 P.2d 1035, 123 A.L.R. 1205].) In cases involving applications for a license, the courts have largely deferred to the administrative expertise of the agency. (See *So. Cal. Jockey Club.* v. *Cal. etc. Racing Bd.* (1950) 36 Cal.2d 167, 174-178 [223 P.2d 1].) Courts are relatively ill-equipped to determine whether an individual would be qualified, for example, to practice a particular profes-

"[12]See footnote 9, *supra*. 'The right to practice one's profession is sufficiently precious to surround it with a panoply of legal protection.' (*Yakov* v. *Board of Medical Examiners, supra,* 68 Cal.2d 67, 75 [64 Cal.Rptr. 785, 435 P.2d 553].) In *Meyer* v. *Nebraska* (1923) 262 U.S. 390, 399 [67 L.Ed. 1042, 1045, 43 S.Ct. 625, 29 A.L.R. 1446], the United States Supreme Court listed the right of the individual 'to engage in any of the common occupations of life' as one of several fundamental liberties, which also include the right of the individual 'to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.' (See *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566 [79 Cal.Rptr. 88, 456 P.2d 645]; *Endler* v. *Schutzbank* (1968) 68 Cal.2d 162, 169-170 [65 Cal.Rptr. 297, 436 P.2d 297]; *Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297, 309 [61 Cal.Rptr. 661, 431 P.2d 245]; *Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499, 501-502 [55 Cal.Rptr. 401, 421 P.2d 409]; *Rosenfield* v. *Malcolm* (1967) 65 Cal.2d 559, 561 [55 Cal.Rptr. 505, 421 P.2d 697]; *Fort* v. *Civil Service Commission* (1964) 61 Cal.2d 331, 334 [38 Cal.Rptr. 625, 392 P.2d 385].)"

sion or trade. (See *Savelli* v. *Board of Medical Examiners* (1964) 229 Cal.App.2d 124, 129, 131-132 [40 Cal.Rptr. 171].) In a case involving the agency's initial determination whether an individual qualifies to enter a profession or trade the courts uphold the agency decision unless it lacks substantial evidentiary support or infringes upon the applicant's statutory or constitutional rights. Once the agency has initially exercised its expertise and determined that an individual fulfills the requirements to practice his profession, the agency's subsequent revocation of the license calls for an independent judgment review of the facts underlying any such administrative decision." (Fns. omitted.) (4 Cal.3d at p. 146.)

The court further explained the fundamental vested-right test in *Interstate Brands* v. *Unemployment Ins. Appeals Bd.* (1980) 26 Cal.3d 770, 774 et seq. [163 Cal.Rptr. 619, 608 P.2d 707]: "The relationship between 'vestedness' in the traditional sense and 'fundamentalness' in the *Bixby* sense is illuminated by a little-noted passage of the opinion which states: '[I]n determining whether the right is sufficiently basic and fundamental to justify independent judgment review, the courts have considered the degree to which that right is "vested," that is, already possessed by the individual.' (4 Cal.3d at p. 146.) Thus it could truly be said that the search for 'vestedness' and the search for 'fundamentalness' are one and the same. The ultimate question in each case is whether the affected right is deemed to be of sufficient significance to preclude its extinction or abridgement by a body lacking *judicial* power. (See and cf. *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34-45 [112 Cal.Rptr. 805, 520 P.2d 29].)" (26 Cal.3d at p. 779, fn. 5.)

Recently, in *Frink* v. *Prod, supra,* 31 Cal.3d 166, 177, we pointed out: "*Bixby* and *Interstate Brands* establish that for purposes of determining applicability of independent judgment review the terms fundamental and vested are not used to establish absolutes but are used in a relative sense, and they show that it is the weighing of both the fundamental nature and the vested nature of the right which determines whether independent judgment review is required. Thus, both cases explaining the term fundamental refer to the effect of the right in economic and human terms and to the importance of it to the individual. (4 Cal.3d at p. 144; 26 Cal.3d at p. 779.) Effect and importance of rights may vary greatly, and by defining fundamental in terms of effect and importance, the cases reflect that the fundamental character of rights may vary significantly. Similarly, *Bixby* speaks of rights being 'possessed' by the individual in discussing the vested requirement (4 Cal.3d at p. 144); *Interstate Brands* specifically recognizes independent judgment review may be applicable although the administrative decision does not involve 'vested property rights in the traditional sense' (26 Cal.3d at p. 779). And both cases refer to the 'degree to which that right is "vested."'" (4 Cal.3d at p. 146; 26 Cal.3d at p. 779, fn. 5.) *Interstate Brands* points out that under the *Bixby* formulation the effect and importance of

rights and the degree to which they are possessed are to be weighed together, stating that the 'search for "vestedness" and the search for "fundamentalness" are one and the same. The ultimate question in each case is whether the affected right is deemed to be of sufficient significance to preclude its extinction or abridgement by a body lacking *judicial* power.' (26 Cal.3d at p. 779, fn. 5.)" (31 Cal.3d at pp. 177-178, fn. omitted.)

In cases not involving licensing, independent judgment review has not been limited to decisions terminating or revoking benefits but has been applied to decisions on applications for benefits. (E.g., *Strumsky* v. *San Diego County Employees Retirement Assn.*, *supra*, 11 Cal.3d 28, 45 [112 Cal.Rptr 805, 520 P.2d 29] [widow's service-connected death allowance]; *Thomas* v. *California Empl. Stab. Com.* (1952) 39 Cal.2d 501, 504 [247 P.2d 561] [unemployment insurance benefit]; *Kerrigan* v. *Fair Employment Practice Com.* (1979) 91 Cal.App.3d 43, 48-52 [154 Cal.Rptr. 29] [age discrimination against applicant for employment]; *Quintana* v. *Board of Administration* (1976) 54 Cal.App.3d 1018, 1021 et seq. [127 Cal.Rptr. 11] [disability pension application].)

In *Frink* v. *Prod, supra,* 31 Cal.3d 166, 172 et seq., we held that an administrative decision denying a claim for public assistance by an alleged disabled person was subject to independent judgment review. It was reasoned that erroneous denial of aid deprives the eligible person of the very means for his survival and his situation becomes immediately desperate, that while the degree to which the right is vested may not be overwhelming the degree of fundamentalness was, and that weighing them together the independent judgment standard should be applied to decisions denying public assistance.

The question of the standard of review to be applied to decisions denying physicians hospital privileges was addressed in *Anton* v. *San Antonio Community Hosp., supra,* 19 Cal.3d 802, 820-825. We held that the right of a doctor to *continue* to practice in a hospital is a fundamental vested right and that a decision *denying reappointment* to the medical staff is reviewed under the independent judgment rule. The court pointed out; "As the court said in *Edwards* v. *Fresno Community Hosp.* (1974) 38 Cal.App.3d 702, 705 [113 Cal.Rptr. 579], '[a]lthough the term "hospital privileges" connotes personal activity and personal rights may be incidentally involved in the exercise of these privileges, the essential nature of a qualified physician's right to use the facilities of a hospital is a property interest which directly relates to the pursuit of his livelihood.'" (19 Cal.3d at p. 823.) Other cases have also recognized that refusal of access to a district hospital could, as a practical matter, have the effect of denying a licensed doctor the right to fully exercise his profession. (*Rosner* v. *Eden Township Hospital Dist.* (1962) 58 Cal.2d 592, 598 [25 Cal.Rptr. 551, 375 P.2d 431]; *Ascherman* v. *Saint Francis Memorial Hosp.* (1975) 45 Cal.App.3d 507, 511 [119 Cal.Rptr. 507]; *Wyatt* v. *Tahoe Forest*

*Hospital Dist.* (1959) 174 Cal.App.2d 709, 715 [345 P.2d 93].) These considerations apply to initial applications for hospital privileges, and the degree of fundamentalness is substantial.

Turning to the vested factor, *Anton* indicated that an applicant for privileges did not have a vested right. The court drew a distinction between a physician who had been admitted to staff membership reflecting a necessary determination of his fitness and one who had not previously been admitted. (19 Cal.3d at p. 824; see also *Lewin* v. *St. Joseph Hospital of Orange* (1978) 82 Cal.App. 3d 368, 383, fn. 12 [146 Cal.Rptr. 892].) A doctor who has been licensed by the state to practice medicine has a vested right to practice his profession, and it cannot be said that there are no elements of a right to be admitted to a hospital. On the other hand, so far as appears, the licensing of a doctor to practice medicine does not include a determination that he is qualified for surgical or other specialties, and when he seeks privileges for his specialty, his qualifications to engage in the specialty are not established by a licensing agency.[5]

In addition, in *Franz* v. *Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 139, footnote 6 [181 Cal.Rptr. 732, 642 P.2d 792] we stated: "Community standards of medical practice, and whether particular type of conduct departs grossly from those standards, are 'legislative' facts. They inform the agency's judgment about what constitutes a violation of the Medical Practice Act." While we were there concerned with the Board of Medical Quality Assurance, boards of hospital districts who are charged with regulating the admission of doctors to their hospitals must make legislative determinations. (Health & Saf. Code, § 32128, subd. 2; *Miller* v. *Eisenhower Medical Center* (1980) 27 Cal.3d 614, 628, fn. 15 [166 Cal.Rptr. 826, 614 P.2d 258].) The independent judgment rule applies only to adjudicatory determinations and does not apply to actions undertaken by an agency in its legislative capacity. (*Strumsky* v. *San Diego County Employees Retirement Assn., supra,* 11 Cal.3d 28, 34, fn. 2.)[6]

---

[5]Dr. Unterthiner has not been admitted to the American Board of Plastic Surgery.

[6]Because the district is a governmental agency, section 1094.5, subdivision (d), providing for substantial evidence review of *private* hospital board decisions, is not directly applicable here.

The subdivision should not be viewed as reflecting legislative intent that either independent judgment review or substantial evidence review is applicable to public hospital decisions refusing to grant surgical privileges. Subdivision (d) was adopted in 1978 (Stats. 1978, ch. 1348, § 1; *Anton* v. *San Antonio Community Hospital* (1982) 132 Cal.App.3d 638, 645 [183 Cal.Rptr. 423]), a year after our decision in *Anton* v. *San Antonio Community Hosp., supra,* 19 Cal.3d 802. As we have seen, that case held that a decision of a private hospital board denying *reappointment* to the medical staff would be reviewed under the independent judgment rule (19 Cal.3d at p. 825], but indicated that review of a denial of an application for staff privilege would be reviewed under the substantial evidence rule (19 Cal.3d at p. 824). It is apparent that the addition of subdivision (d) was designed to reject our *Anton* holding on reappointment and adopt the substantial evidence rule for decisions of private hospitals denying reappointment. In these circumstances, there is little reason to believe that the Legislature in adopting subdivision (d) was contemplating the standard of review for public hospital decisions denying an application

Weighing the degree of vestedness and fundamentalness as required by *Frink, Interstate Brands* and *Bixby,* we are satisfied that we should continue to follow the *Anton* distinction and adhere to the rule that substantial evidence review applies to decisions denying initial applications for hospital privileges. Health and Safety Code section 32128, subdivision 2 provides that the hospital will impose requirements in addition to possession of a license to practice medicine as a condition to the grant of privileges. (See *Miller* v. *Eisenhower Medical Center, supra,* 27 Cal.3d 614, 628, fn. 15; *Anton* v. *San Antonio Community Hosp., supra,* 19 Cal.3d 802, 818-820.) The doctor's license thus does not determine qualification for hospital privileges or establish competence to engage in specialties in the hospital, particularly where the privilege sought will require close cooperation with other physicians and surgeons. The determination of the standards to be applied in granting privileges involves a legislative judgment (*Franz* v. *Board of Medical Quality Assurance, supra,* 31 Cal.3d 124, 139, fn. 6), and just as courts have largely deferred to administrative expertise in determining whether an applicant is qualified to practice a profession in the first instance (*Bixby* v. *Pierno, supra,* 4 Cal.3d 130, 146), they should defer to administrative expertise in determining whether the professional is qualified to take on the additional responsibilities involved in a grant of hospital privileges. While access to a hospital may be crucial to a doctor's livelihood in some cases, the licensed doctor seeking hospital privileges is not in a substantially different position than the medical school graduate seeking a license to practice medicine. In each case, the substantial evidence rule applies.

## II. Administrative Findings

■ The evidence of untruthful answers on the application and before the ad hoc committee is undisputed. Despite the request for all hospital affiliations past and present, Dr. Unterthiner omitted Palmdale Community Hospital where he had been suspended and resigned. According to his own testimony he had been tearing up letters from the chief of staff at about the same time that he was applying to Desert Hospital. Similarly, it is undisputed that he was denied privileges at two Santa Barbara hospitals, and he answered in the negative to the question whether he had ever been denied membership in any medical organization. When asked at the ad hoc committee hearing whether he had problems or clashes in the Lancaster-Palmdale area, he stated that he did not have any specific problems, but he subsequently testified before the hearing officer to the problems at the Palmdale Community Hospital, and it was also undisputed that he resigned from Antelope Valley Hospital at a time when disciplinary proceedings had been initiated.

for appointment. While it may seem reasonable to conclude that the 1978 enactment reflects legislative intent to approve the *Anton* decision except insofar as the enactment changed it, it seems equally reasonable to conclude that the adoption of the substantial evidence standard for private hospitals without mentioning governmental hospitals reflects intent to apply independent judgment review to decisions of the latter hospitals, including decisions denying appointment.

The explanations of the false statements do not create a true conflict in the evidence. His explanation that his wife filled out the application and signed it and that he did not review it carefully is questionable when we remember that he was well aware that approval of his applications for hospital privileges in Santa Barbara had been delayed, that there were problems, and that because of the delay he had moved to the Lancaster-Palmdale area three years earlier. The application clearly stated that any significant misstatements or omissions constitute cause for denial of appointment, and even if we assume that he did not receive the rejections from the two Santa Barbara hospitals, he did not explain why—given the importance of hospital privileges to surgeons—he never sought to find out what occurred with his applications in Santa Barbara. In the circumstances, his cavalier attitude toward the application in the instant case is difficult to credit, and even if we do credit the cavalier attitude, the explanation does not justify the falsehoods.

As to the suspension-resignation at Palmdale Community Hospital and the disciplinary proceeding at Antelope Valley Hospital, his claim was that his conduct was proper; but the question asked at the ad hoc committee was whether there were problems, and, even assuming that his conduct was proper, it is obvious that there were major problems.

The basic findings of falsehood are supported by undisputed evidence and are not adequately explained. In addition, there is other undisputed evidence showing a lack of veracity in relation to hospital activities. He did not deny that he left in the midst of surgery when he was proctoring a doctor having only temporary privileges, that he reported that he proctored the surgery and that he completed the postoperative evaluation before the patient left the operating room. He did not claim that in Santa Barbara when he failed to appear for scheduled surgery or appeared tardily due to his admitted moonlighting at the Los Angeles hospital he advised his mentors or associates of the true reason for his failure to perform his assigned duties.

The findings of falsehoods and failure to satisfy ethical standards are amply supported. While there was no specific finding of adverse effect on patient care (*Miller* v. *Eisenhower Medical Center, supra,* 27 Cal.3d 614, 628-630),[7] the obvious purpose of the questions on the application and of the hearings was to obtain a basis for determining whether a grant of privileges would have such effect.

### III. TRIAL COURT FINDINGS

Ordering Dr. Unterthiner's admission to the medical staff, the trial court concluded that the board's decision was not based on the false answers but was in-

---

[7]The administrative proceedings took place prior to our decision in *Miller.*

stead based on the derogatory letters from three doctors. There is no evidence to impeach the board decision which states its grounds.

The trial court's finding that the doctor could not receive a fair hearing from the hospital district is also without record support. Dr. Unterthiner urges that in reporting comments received, the credentials committee overstated the derogatory comments and left out favorable comments. But the report only purported to include the derogatory comments. One letter was misstated, but the misstatement does not establish bias.[8]

The trial court also found that the district embraced letters from doctors who had had no contact with Dr. Unterthiner for a number of years, rejecting favorable letters from doctors who had more recent contacts, and that the district made no real effort to determine the truth of the letters from the three doctors. However, the basis of the district's decision was current false statements in the application and his testimony as to lack of problems in the Lancaster-Palmdale area. The district's findings did not resolve the conflict between the letters.

The findings of the trial court are not supported by the record. The district's findings supported by substantial evidence warrant denial of the application, and the trial court should have denied the petition for writ of mandate.

The judgment is reversed with directions to enter judgment denying the petition for writ of mandate.

Richardson, J., Kaus, J., and Feinberg, J.,* concurred.

Bird, C. J., Mosk, J., and Reynoso, J., concurred in the judgment.

---

[8]The statement in the report was: "Those who speak in a derogatory vein far outnumbered those who found his work satisfactory." In the letter the larger number found the work satisfactory. The doctor who wrote the letter subsequently testified.

*Assigned by the Chairperson of the Judicial Council.