[No. B045784. Second Dist., Div. Four. Dec. 13, 1990.]

HOLLY WILLIAMS, a Minor, etc., Plaintiff and Appellant, v. GARY D. MACOMBER, as Director, etc., Defendant and Respondent; SAN GABRIEL/POMONA REGIONAL CENTER, Real Party in Interest.

**COUNSEL**

Shield & Smith and K. Michele Williams for Plaintiff and Appellant.

Marilyn Holle as Amicus Curiae on behalf of Plaintiff and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Robert L. Mukai, Chief Assistant Attorney General, Charlton G. Holland, Assistant Attorney General, Anne S. Pressman and John H. Sanders, Deputy Attorneys General, for Defendant and Respondent.

Pachter & Schaffer, Judith A. Enright and Patricia G. Williams for Real Party in Interest.

---

OPINION

GEORGE, Acting P. J.—Holly Williams, a "profoundly retarded" and disabled minor, appeals through her guardian ad litem from a judgment denying her petition for writ of mandate to compel the director of the State Department of Developmental Services to provide her with day-care services in her home pursuant to the Lanterman Developmental Disabilities Services Act (hereafter referred to as the Lanterman Act or the Act). ■ ■■ ■■ (Welf. & Inst. Code, § 4500 et seq.)[1] Appellant contends (1) the superior court applied an incorrect standard of review of the administrative decision, and (2) denial of the requested services is inconsistent with the letter and spirit of the Lanterman Act. For the reasons that follow, we reverse the judgment.

### PROCEDURAL AND FACTUAL HISTORY

The factual summary that follows is based upon the findings of fact made by the administrative hearing officer. Appellant, a client of real party in interest, the San Gabriel/Pomona Regional Center (referred to hereafter as the Regional Center), is "profoundly retarded"[2] and suffers from severe quadriplegia impact, periodic grand mal seizures, hearing loss, and severely

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

The Lanterman Act is "a comprehensive statutory scheme . . . to provide a 'pattern of facilities and services . . . sufficiently complete to meet the needs of each person with developmental disabilities . . . .'" (*Association for Retarded Citizens* v. *Department of Developmental Services* (1985) 38 Cal.3d 384, 388 [211 Cal.Rptr. 758, 696 P.2d 150].) Developmental disabilities include mental retardation, cerebral palsy, epilepsy, and autism. (*Id.*, at p. 388, fn. 2.) "The purpose of the statutory scheme is twofold: to prevent or minimize the institutionalization of developmentally disabled persons and their dislocation from family and community [citations], and to enable them to approximate the pattern of everyday living of nondisabled persons of the same age and to lead more independent and productive lives in the community [citations]." (*Id.*, at p. 388.)

[2] A person with an IQ below 20 is classified as profoundly retarded. (*Conservatorship of Valerie N.* (1985) 40 Cal.3d 143, 147, fn. 3 [219 Cal.Rptr. 387, 707 P.2d 760.]) "The profoundly mentally retarded 'display minimal capacity for sensorimotor functioning. A highly structured environment, with constant aid and supervision, is required. During the school-age period, some further motor development may occur and the children may respond to minimal or limited training in self-care. Some speech and further motor development may take place during the adult years, and very limited self-care may be possible, in a highly structured environment with constant aid and supervision.' (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (3d ed. 1980) pp. 38-40.)" (*Ibid.*)

impaired vision. She is unable to feed, dress, or bathe herself, and is incontinent of bladder and bowel, requiring her to wear diapers. She responds to her name and communicates by whimpering, smiling, and making cooing sounds.

Appellant resides with her parents and her younger brother and attends a special education program at public school. A specially equipped school bus arrives at appellant's home shortly after 7:30 a.m. and returns appellant approximately 2 p.m. Both of appellant's parents are employed full time.

Prior to December 1988, appellant's parents employed a live-in homemaker to care for appellant and appellant's brother (who is not handicapped) and provide some housecleaning and cooking services. The Regional Center provided funds for 36 hours per month of "respite care,"[3] applying this sum toward the salary of the live-in homemaker.

In December 1988, when appellant was 14 years of age, the live-in homemaker quit her position. Appellant's parents found they would be required to pay "a substantially increased salary" in order to obtain a suitable replacement, because it had become more difficult to care for appellant as she grew older.

By letter dated January 21, 1989, appellant's mother requested that the Regional Center provide "financial assistance to procure qualified and competent in-home care" for appellant during working hours. Appellant's mother stated she had been unable to find a live-in caretaker for appellant "for the kind of money we can afford to pay," noting that due to appellant's "age, size and physical needs, the type of care she requires goes well beyond the ordinary child care requirements" of a child who is not disabled. Appellant's mother stated that the situation had become "so desperate" that she and her husband reluctantly had considered placing their daughter "in an out-of-home residential care program," although their "fervent desire" was to keep appellant at home.

By letter dated January 27, 1989, the Regional Center denied the request for financial assistance, because it "does not meet Regional Center Purchase of Service guidelines."[4] The guidelines referred to are part of a document

[3] " 'In-home respite services' means intermittent or regularly scheduled temporary non-medical care and supervision provided in the client's own home . . . ." (§ 4690.2, subd. (a).) One purpose of respite services is to "[r]elieve family members from the constantly demanding responsibility of caring for the client." (§ 4690.2, subd. (a)(3).)

[4] "A regional center may purchase services for a client from any individual or agency which has been properly vendored and which the regional center determines will best accomplish all or any part of that client's program plan." (§ 4648, subd. (b)(1).)

entitled "Purchase of Service Policy," which contains "specific standards for each category of service" provided by the Regional Center. The purchase of service policy specifies that exceptions to these guidelines are made only "under unusual circumstances."

Appellant's mother challenged this decision by requesting a "fair hearing" (§ 4710.5), and the required informal meeting (§ 4710.7) between appellant's mother and a representative of the Regional Center was held on February 9, 1989. The Regional Center issued a written decision on February 13, 1989, reflecting that appellant's mother asserted her family was able to pay a live-in caretaker $400 per month, in addition to room and board, but applicants for the position were requesting "up to $800.00 per month (net)." Although acknowledging awareness "of the many problems" encountered by appellant's mother, the Regional Center denied the requested assistance, stating: "This regional center is, however, bound to deliver only those services approved by the Board of Directors and outlined in the Purchase of Service Policies (P.O.S.). Funding for in-home income maintenance for childcare is not one of the approved services . . . ."

Appellant's mother pursued an administrative appeal of the decision of the Regional Center. (§ 4710.9, subd. (a).) An evidentiary hearing was held on March 17, 1989. On March 24, 1989, the administrative law judge issued a decision concluding that the purchase of service policy did not authorize child-care services for clients with working parents and that this policy was not unreasonable. The decision further states: "The Lanterman Act recognizes, at least by implication, the basic responsibility of parents to provide for their children. The act certainly does not require the state in the first instance to meet every need of the disadvantaged person . . . . [¶] . . . No state law or regulation has been presented in th[ese] proceedings which requires the Regional Center to provide either residential day care or early morning and late afternoon day care for Claimant so that Claimant's parents may continue in their employment."

On June 22, 1989, appellant filed a petition for writ of mandate in the superior court. (Code Civ. Proc., § 1094.5.) Applying the substantial evidence standard of review, the court found that "home supportive services are not mandated" under the purchase of services contract. The court further stated "the 36-hour limitation" on respite care "was not a hard and fast limitation" and, therefore, "it did not amount to an arbitrary, capricious, never to be varied limitation." On September 8, 1989, judgment was entered in favor of the director of the Department of Developmental Services and the Regional Center.

## DISCUSSION

## IT WAS IMPROPER FOR THE REGIONAL CENTER TO DENY APPELLANT'S REQUEST FOR DAY-CARE SERVICES BASED ON A POLICY OF DENYING SUCH SERVICES WITHOUT REGARD TO THE INDIVIDUAL CIRCUMSTANCES OF THE CLIENT

### A. *The Standard of Review*

The superior court upheld the decision of the administrative agency, concluding it was supported by substantial evidence. Appellant contends the court was required to exercise its independent judgment as to the weight of the evidence. (*Unterthiner* v. *Desert Hospital Dist.* (1983) 33 Cal.3d 285, 293-294 [188 Cal.Rptr. 590, 656 P.2d 554].)

■ Code of Civil Procedure section 1094.5, subdivision (c), provides that the superior court, when "authorized by law" to do so, should exercise its independent judgment in reviewing the evidentiary basis of an administrative agency's adjudicatory decision. In all other cases, the court should determine whether the agency's findings are supported by substantial evidence. "In other words, the courts are left with the ultimate task of deciding which cases warrant [independent judgment] review. [Citations.]" (*County of Alameda* v. *Board of Retirement* (1988) 46 Cal.3d 902, 906 [251 Cal.Rptr. 267, 760 P.2d 464].)[5]

We need not, and do not, determine whether the superior court correctly utilized the substantial evidence standard of review or should have applied the more stringent independent judgment standard of review, because under either standard the decision of the administrative agency must be reversed. As explained below, the Regional Center's denial of the requested services on the basis of a general policy against providing day-care services to clients with working parents cannot be reconciled with the requirements of the Lanterman Act.

---

[5] "[T]he independent judgment test had its historical roots in the notion that agencies lacking in judicial power are precluded from performing judicial functions . . . . [T]he essence of this function is to make binding determinations on conflicting evidence, particularly where constitutional liberty and property interests are involved. [Citation.] To uphold such a decision by a 'nonjudicial' agency, without allowing the court to reweigh the evidence, would offend separation of powers principles . . . . [¶]Accordingly, . . . the independent judgment test was first applied to administrative adjudications which threatened to deprive the aggrieved party of a constitutionally protected property right . . . . [¶][I]ndependent judicial review is required whenever a 'fundamental vested right' is at stake . . . . [¶]We have seen a steady expansion in the class of rights which fits this description." (*County of Alameda* v. *Board of Retirement, supra*, 46 Cal.3d 902, 906-907.)

## B. *The Lanterman Act*

The Lanterman Act was designed to provide a "pattern of facilities and services . . . sufficiently complete to meet the needs of each person with developmental disabilities, regardless of age or degree of handicap, and at each stage of life."[6] (§ 4501.) In enacting this legislation, the Legislature declared: "The State of California accepts a responsibility for its developmentally disabled citizens and an obligation to them which it must discharge." The Act grants persons with developmental disabilities "certain statutory rights, including the right to treatment and habilitation services at state expense. (See §§ 4502, 4620, 4646-4648.)" (*Association for Retarded Citizens* v. *Department of Developmental Services, supra*, 38 Cal.3d 384, 389, fn. omitted.)

"In order for the state to carry out many of its responsibilities as established in this division," the Act directs the State Department of Developmental Services to contract with "appropriate private nonprofit corporations for the establishment of" a "network of regional centers." (§§ 4620, 4621.) Regional centers are authorized to "[p]urchase . . . needed services . . . which the regional center determines will best" satisfy the client's needs. (§ 4648.) The Act declares: "It is the intent of the Legislature to encourage regional centers to find innovative and economical methods" of serving their clients. (§ 4651.) The Act directs that: "A regional center shall investigate every appropriate and economically feasible alternative for care of a developmentally disabled person available within the region." (§ 4652.)

■ In the present case, the sole reason advanced by the Regional Center for its denial of appellant's request that she be provided day-care services in her home during the hours immediately before and after school, was that its policy was not to provide such services. We conclude, for a number of reasons, that this explanation constitutes an insufficient basis for denying the requested services.

First, the Regional Center's reliance on a fixed policy is inconsistent with the Act's stated purpose of providing services "sufficiently complete to meet the needs of each person with developmental disabilities." (§ 4501.) The Act clearly contemplates that the services to be provided each client will be selected "on an individual basis." (*Association for Retarded Citizens* v. *Department of Developmental Services, supra*, 38 Cal.3d 384, 388.)

---

[6] As defined in the Act, " 'Developmental disability' means a disability which originates before an individual attains age 18, continues, or can be expected to continue, indefinitely, and constitutes a substantial handicap for such individual . . . . [T]his term shall include mental retardation, cerebral palsy, epilepsy, and autism . . . but shall not include other handicapping conditions that are solely physical in nature." (§ 4512, subd. (a).)

Second, the services requested by appellant are among those which the Lanterman Act was designed to provide in appropriate circumstances. The Act defines the term " 'Services for persons with developmental disabilities' " to include "day care." (§ 4512.) Section 4685 further provides that assistance to families caring for their developmentally disabled children at home "may include . . . respite for parents, homemaker services, . . . day care, . . . [and] babysitting . . . ." The Regional Center's policy of categorically denying day-care services to clients with working parents is contrary to the Act.

Third, the Regional Center failed to determine whether such services were necessary to permit appellant to remain in her home. A primary purpose of the Act is "to prevent or minimize the institutionalization of developmentally disabled persons and their dislocation from family." (*Association for Retarded Citizens* v. *Department of Developmental Services, supra*, 38 Cal.3d 384, 388.) In strong terms, the Act declares: "The Legislature places a high priority on providing opportunities for children with developmental disabilities to live with their families," requiring the state to "give a very high priority to the development and expansion of programs designed to assist families in caring for their children at home." (§ 4685, subd. (a).) In language directly applicable to the present case, section 4685, subdivision (b), states that "regional centers shall consider every possible way to assist families in maintaining their children at home, when living at home will be in the best interest of the child . . . ." (§ 4685, subd. (b).)

Appellant's mother testified she had been forced to consider an out-of-home placement for appellant because of the denial of day-care services. The Regional Center violated the direct command of section 4685, subdivision (b), by failing to determine whether day-care services were necessary to permit appellant to remain with her family.

We do not hold that appellant necessarily must be provided with day-care services—only that application of an inflexible policy denying such services is contrary to the Act. Whether appellant is entitled to day-care services depends upon a consideration of *all* relevant circumstances.

■ The Lanterman Act "grants the developmentally disabled person the right to be provided at state expense with only such services as are consistent with its purpose." (*Association for Retarded Citizens* v. *Department of Developmental Services, supra*, 38 Cal.3d 384, 393.) As noted previously, a primary purpose of the Act is to "minimize the institutionalization of developmentally disabled persons and their dislocation from family." Providing day-care services to clients with working parents is consistent

with this purpose to the extent that such action is necessary to enable the client's parents to care for their child in their home.

The conclusion we reach is supported both by the language of section 4685, subdivision (c), which provides that a "fair hearing" may be requested "[i]f the parent of any child receiving service from a regional center believes that the regional center is not offering adequate assistance *to enable* the family to keep the child at home" (italics added), and by the observation in *Conservatorship of Valerie N., supra,* 40 Cal.3d 143, 159, that "[t]he Legislature has given high priority to the provisions of services necessary to enable children to remain in the home of their parents." (Italics added.) The extent to which day-care services are "necessary to enable" a child to remain at home depends upon numerous factors, some of which were not considered in the present case because of the policy adopted by the Regional Center.

### Disposition

The judgment is reversed. On remand, the superior court is directed to issue a writ of mandate ordering the director of the Department of Developmental Services to consider appellant's request for day-care services in accordance with the views expressed in this opinion. Appellant is to recover her costs on appeal.

Goertzen, J., and Epstein, J., concurred.

Petitions for a rehearing were denied January 4, 1991.