[Civ. No. 64674. Second Dist., Div. Two. Mar. 8, 1983.]

VINCENT CIPRIOTTI, Plaintiff and Respondent, v.
BOARD OF DIRECTORS OF NORTHRIDGE HOSPITAL
FOUNDATION MEDICAL CENTER, Defendant and Appellant.

**COUNSEL**

Musick, Peeler & Garrett, Joseph A. Saunders, Jay D. Christensen and Maryl D. Raskin for Defendant and Appellant.

Richard E. Schlottman for Plaintiff and Respondent.

## OPINION

## BEACH, J.—

### NATURE OF APPEAL:

The hospital privileges of a physician (petitioner) were suspended by appellant (hospital). The suspension was confirmed by the judicial review committee after administrative hearing provided by hospital pursuant to its bylaws. The trial court granted respondent's petition for writ of mandate on the basis that hospital did not follow its own rules of procedure and that there was not substantial evidence to support the decision of the judicial review committee. Hospital appeals. We reverse.

We recite the facts from the record made at the administrative hearing. The trial court took no additional evidence.

### FACTUAL BACKGROUND:

Prior to 1979, petitioner had become a member of appellant hospital's medical staff with clinical privileges to practice psychiatric medicine. The chairman of that department was Dr. Weiland and the medical director of the psychiatric service was Dr. Michael Gross.

During 1978 and 1979, Dr. Gross and Dr. Weiland became aware of a number of incidents demonstrating a serious problem in petitioner's relationship with his physician colleagues, hospital's staff and hospital's patients. This problem was first demonstrated by petitioner's refusal, over an extended period of time, either to attend mandatory biweekly patient staffing conferences, or to keep mandatory patient admitting histories and progress notes.

In the psychiatric unit, biweekly patient staffing conferences are conducted for each patient. These conferences are attended by the patient's attending physician together with nurses, social workers from the psychiatric unit and the unit's medical director, Dr. Gross. Attendance by the patient's doctor at the "staffings" is mandatory. "To be allowed to hospitalize patients in this patient unit, one has to consistently attend a staffing at a minimum of every two weeks. It is part of the agreement for admitting privileges. . . ."

During 1978, petitioner consistently failed to attend staffing conferences. After several discussions with petitioner regarding the problem, Dr. Gross sent petitioner a letter, dated November 30, 1978, noting that petitioner's patients were not being staffed at the required frequency. The letter went on to admonish petitioner to attend staffings or face review of his admitting privileges. Following receipt of the letter, petitioner's staffing attendance improved only marginally. Petitioner also failed to comply with the department's requirements for documenting patient histories and progress notes as the department requires. Petitioner failed to do such documentation during both 1978 and 1979. On one occasion, petitioner neglected to make progress notes "for several weeks in a row." In June 1979, petitioner's failure to prepare histories and progress notes resulted in the transfer of a county suicidal psychiatric patient from petitioner's care to the care of another physician at the insistence of a county medical officer.

These incidents were not isolated behavior problems. For example, in 1978, petitioner entered inappropriate and disrespectful comments on a patient's chart; on one occasion he improperly circumvented hospital's admitting procedure in order to admit a patient; for several months in 1978 he retained duplicate insurance payments rather than promptly returning them to patients; in mid-1978, he initially refused to attend a mandatory court hearing for one of his patients; and in January 1979, he admitted a patient whom he knew to be under the care of another physician without notifying the other physician.

Other incidents were more serious. They included: (1) giving a violent emergency patient 100 milligrams of Thorazine (a powerful tranquilizer), which was four times the recommended dose. This was done by pouring off the medicine into an uncalibrated container and in an unmeasured amount; (2) improperly supplying hospital employees dangerous controlled substances, in one case to a person with a mental disorder which was such that the giving of the drugs to such a person was in the opinion of one staff member like "pouring gasoline on a fire"; (3) condoning use of controlled drugs at parties at his residence and attended by hospital employees including the psychiatric unit employees; (4) displaying a hashish pipe and condoning the use of controlled substances and dangerous drugs in the presence of employees and a patient of the psychiatric unit; and (5) having parties where unit workers smoked marijuana and used drugs which resulted in the tardiness at work of the employees the following mornings. Petitioner's attitude towards this conduct, as indicated at the judicial review hearing, was that it was not "horrible," presumably meaning that it was in petitioner's point of view unimportant.

The department of psychology had attempted to help petitioner overcome these problems. Acting under the "corrective action" powers contained in

article VII, section 1 of the bylaws, the department had placed petitioner on temporary probation. This action was in response to his failure both to attend patient staffing conferences and to prepare histories and progress notes. As a condition to his continued exercise of clinical privileges, petitioner was required to obtain consultation and supervision by an outside psychiatrist for all of his psychiatric cases. In addition, petitioner was required, during the probationary period, to resume psychotherapy for himself. Petitioner had initiated psychotherapy with his own psychiatrist, Dr. Wahl, in approximately 1969. He had been out of therapy for about a year and a half prior to resuming therapy in August 1979. Dr. Wahl characterized petitioner's symptoms as "neurotic." Referring to petitioner's problems as a member of hospital's medical staff, Dr. Wahl characterized petitioner's conduct as "rebellion towards authority"; "immature and self-destructive"; and "ill considered and improvident". Although petitioner's temporary probation ended in approximately November 1979, petitioner continued to consult with Dr. Bell and also continued to see Dr. Wahl three days a week. The incidents which immediately precipitated petitioner's summary suspension occurred the following month.

On December 7, one of petitioner's patients was returned from a sentencing in a criminal action. He became violent and could not be handled by the nurses on duty. Petitioner was eventually located and petitioner ordered a certain amount of Thorazine. The patient became worse and the nurses again called petitioner who then increased the amount and frequency of the dosage. At this point, the alarmed nursing staff called in Dr. Gross, who telephoned petitioner. Dr. Gross advised petitioner that in order to end the episode, the patient should receive smaller but much more frequent doses administered by injection. After some argument on the point, petitioner agreed and this strategy finally brought the episode to an end. Dr. Gross testified that petitioner's handling of the December 7 incident was "not good management" of the patient and that it endangered both the patient and the staff.

On December 11, petitioner discussed the treatment of this same patient with Dr. Gross and the latter recommended that petitioner put the patient on a certain routine of medication. Petitioner was not in agreement with this suggestion but apparently acquiesced in it. When petitioner then attempted to have the patient accept the medication, the patient refused. Petitioner thereupon directed the patient to contact Dr. Gross directly and discuss the matter with him. This reference of petitioner's patient directly to Dr. Gross was a serious breach in the accepted methods of psychiatric treatment.

In Dr. Gross' judgment, this conduct was manipulative, unethical, dishonest and a threat to proper patient care in the department. He testified at

the judicial review hearing: "I felt that things were starting up again and there was going to be an incident of continued practice that was unacceptable to the department." Petitioner admitted that by suggesting to the patient that he confront Dr. Gross, petitioner was "indirectly trying to get Dr. Gross to do a consultation on the patient." He also admitted that the correct way would be to ask Dr. Gross to do an evaluation on the patient. Immediately following the December 11 incident, Dr. Gross met with Dr. Weiland, the department chairman, and recommended that petitioner's privileges be summarily suspended. Dr. Gross and Dr. Weiland considered all of the incidents summarized above since, in their professional judgment, the entire pattern of misconduct demonstrated that petitioner's continued practice at hospital would endanger the safety of patients, staff and others. Dr. Gross testified: "And it was at this point that the suspension after a discussion with the Chairman of the department was done, not for one single incident, but for the accumulation of all of this. . . ." Petitioner fully understood that the suspension was not merely because of a difference of opinion with Dr. Gross relating to the December 7 and 11 incidents. He was asked: "Do you feel that this is a matter of difference of opinion between you and Dr. Gross as to how such patients should be handled, and how that particular patient was to be evaluated?" Petitioner replied: "I think it's more than that, I think it is probably the sum total of circumstances and events over the past year and a half."

PROCEDURAL BACKGROUND:

Article VII of the bylaws provides two distinct procedures for "corrective action" regarding any medical staff member. One corrective action process set forth in section 1 deals with routine, nonemergency situations. The other, section 2, and entitled "summary suspension" process, deals with situations which pose an immediate danger to patients or others at the hospital. The nonemergency corrective action process authorizes various officers of the medical staff or hospital to request corrective action to be taken against a physician whenever his activities or professional conduct are "considered to be harmful to patient care or lower than the standards or aims of the medical staff, or to be disruptive to the operations of the Hospital." Corrective action even under the nonemergency, section 1, may include temporary suspension or revocation of clinical privileges or imposition of conditions on the exercise of clinical privileges.

Once corrective action is requested, the following procedure applies: (1) the executive committee forwards the request to the physician's clinical department; (2) the clinical department undertakes an investigation of the matter which, if the physician requests, may include an interview with the physician; (3) the department makes a report to the executive committee;

(4) the physician is permitted to meet with the executive committee; and (5) the executive committee decides what action to take. This action may include "suspension or revocation of clinical privileges." If the executive committee recommends reduction, suspension or revocation of privileges, the physician may request a full evidentiary hearing before a judicial review committee as provided by article VIII of the bylaws and thereafter request an appeal to the governing body.

The emergency summary suspension provisions are contained in article VII, section 2. They permit certain hospital officers to summarily suspend a physician's privileges (effective immediately) when such "action must be taken immediately in the best interest of patient care." A physician whose privileges have been summarily suspended is entitled, by section 2(b), to request an informal review of the summary action by the executive committee within a reasonable time. The executive committee may modify, continue or terminate the summary suspension; but if the suspension is left in effect, the physician may request "appellate review" of the summary action by the governing body. Thus, the only procedure expressly provided to review the summary aspect of a suspension is to request a hearing before the executive committee under section 2(b).

If a practitioner elects not to contest the summary aspect of a suspension, he may, nonetheless, contest the suspension itself by requesting a full evidentiary hearing before a judicial review committee (also with rights to appeal to the governing body) under article VIII. "Suspension of privileges" is one of the grounds for article VIII judicial review committee hearings. (Art. VIII, § 2(b)(9).)

Thus, both methods of initiating medical staff disciplinary action (the corrective action process of art. VII, § 1, and the summary suspension process of art. VII, § 2) may lead to a judicial review committee hearing under article VIII. Whenever a physician requests an article VIII hearing, the executive committee and the judicial review committee are required to follow the full, common law requirements of "fair procedure."

The executive committee must appoint an unbiased panel of medical staff members to act as the judicial review committee, and must give written notice both of the time and place of the hearing and of the "acts or omissions with which the medical staff member is charged." Other procedural protections assure the practitioner an opportunity to confront the witnesses and evidence against him and to present his defense. Following the judicial review committee hearing, the committee's decision is "final, subject only to the right of appeal" to the governing body. Thus, regardless of how a physician comes before the judicial review committee (through the correc-

tive action process or the summary suspension process) the judicial review committee has jurisdiction to consider all evidence which is relevant to the charges contained in the notice of charges and to impose any appropriate remedy, including termination of privileges.

DISCUSSION:

Code of Civil Procedure section 1094.5 provides the guidelines for examining the validity of an administrative decision such as in issue at bench. Subdivision (d) thereof provides that ". . . in cases arising from *private* hospital boards . . . abuse of discretion [by the administrative body] is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record. . . ." (Italics added.)

The trial court based its ruling on its finding that the judicial review committee findings were not supported by substantial evidence. It also concluded that all of the evidence relative to the events other than the December 7 and 11 incidents were irrelevant and not entitled to be considered by the judicial review committee. The court erred. It misinterpreted the bylaws and its ruling in this regard is supported by neither case law nor statute. Neither the bylaws nor any other rule limited the judicial review committee to consider only the events of December 7 and 11. Those events precipitated the summary suspension. However, they were but only a part of a larger picture and were like the proverbial straw that broke the camel's back. Evidence of the other events relative to petitioner's past conduct was competent and relevant and necessary to determine the significance of petitioner's latest acts as they related to the safety of the patients of the hospital and the probable effect of permitting petitioner to remain as a physician treating psychiatric patients. Thus, suspension summarily imposed under article VII, section 2 because of some urgency, validly may be in effect during the time corrective action proceedings are taking place under article VII, section 1. There is nothing in the summary suspension provisions of section 2 requiring evidence to be limited only to the precipitating cause for the summary suspension.

As to the December 7 and 11 circumstances and incidents, irrespective of concluding lack of substantial evidence, the trial court applied its independent judgment characterizing the evidence before the judicial review committee as a mere difference of medical opinion between petitioner and Dr. Gross. It was an improper usurpation of the factfinding and conflict-resolving function of the administrative body—here hospital's judicial review committee.

Moreover, Code of Civil Procedure section 1094.5, subdivision (d) requires the trial court to determine whether the administrative findings are

supported "in the light of the *whole* record," not merely that part of the evidence in the record or the interpretation thereof which the trial court decides to accept as more credible or probable, or which results from the trial court's substitution of its preferred resolution of conflicts between medical opinions in place of those made by the administrative committee (here the judicial review committee).

Under the substantial evidence test, it is not the function of reviewing courts to resolve differences of medical judgment. Dr. Gross' view of the matter was concurred in by Dr. Weiland (the department chairman) and by the unanimous panel of physicians constituting the judicial review committee. It is a reasonable judgment and must be upheld under the substantial evidence test. ■ "In this examination we must view the evidence in the light most favorable to the [agency's] findings and indulge all reasonable inferences in support thereof." (*Hosford* v. *State Personnel Bd.* (1977) 74 Cal.App.3d 302, 306-307 [141 Cal.Rptr. 354].) Although the instant matter involves suspension of privileges rather than initial admission, nonetheless the testimony of the administrative experts should have been accorded more recognition by the trial court as constituting the substantial evidence which it in fact was. ■ "[J]ust as courts have largely deferred to administrative expertise in determining whether an applicant is qualified to practice a profession in the first instance [citation], they should defer to administrative expertise in determining whether the professional is qualified to take on the additional responsibilities involved in a grant of hospital privileges." (*Unterthiner* v. *Desert Hospital Dist.* (1983) 33 Cal.3d 285, 298 [188 Cal.Rptr. 590, 656 P.2d 554].)

■ Termination of vested medical staff privileges by *public* hospitals in this state is reviewed under the independent judgment test. (See *Anton* v. *San Antonio Community Hosp.* (1977) 19 Cal.3d 802 [140 Cal.Rptr. 442, 567 P.2d 1162].) In 1978, however, the Legislature amended Code of Civil Procedure section 1094.5 to provide that "in cases arising from *private* hospital boards . . . abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in light of the whole record." (Code Civ. Proc., § 1094.5, subd. (d); *Anton* v. *San Antonio Community Hosp.* (1982) 132 Cal.App.3d 638; italics added.) ■ Thus, in reviewing the evidence in support of petitioner's summary suspension, the trial court was required to apply and limit its examination to the substantial evidence test. (*Unterthiner* v. *Desert Hospital Dist., supra,* 33 Cal.3d 285; *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 149 [93 Cal.Rptr. 234, 481 P.2d 242].)[1]

---

[1]Under Code of Civil Procedure section 1094.5, subdivision (d) the "substantial evidence test" rule rather than the "independent review" applies to the review of private hospital

 In applying the substantial evidence test, a reviewing court must uphold the administrative decision (in this case hospital judicial review committee's decision) unless the administrative findings "viewed in the light of the entire record, [are] so lacking in evidentiary support as to render [them] unreasonable. . . ." (*Northern Inyo Hosp.* v. *Fair Emp. Practice Com.* (1974) 38 Cal.App.3d 14, 24 [112 Cal.Rptr. 872].) When reviewing the entire record, the court, nonetheless, may not substitute its judgment for that of the agency: "the trial court may [not] disregard or overturn [an agency's] finding ' "for the reason that it is considered that a contrary finding would have been equally or more reasonable." ' " (*Ibid.*; *Unterthiner* v. *Desert Hospital Dist., supra,* 33 Cal.3d 285.)

 At bench there was substantial evidence which consisted of the testimony of Dr. Gross relating to the December 7 and 11 incidents together with the admissions of petitioner. Nonetheless, the trial court discounted the evidence of Dr. Gross as merely hearsay. But the court erred in two respects in this regard. First, the law does not require the exclusion of such hearsay in administrative matters (assuming Dr. Gross' testimony was hearsay) when such hearsay is corroborated and, secondly and perhaps more importantly, that portion of Dr. Gross' testimony which was actual hearsay related only to the contents of the conversation of petitioner's patient with Dr. Gross. The crucial fact and the one in issue was whether the patient was told by petitioner to call Dr. Gross and whether in fact petitioner's patient did call Dr. Gross. The fact of calling and speaking to Dr. Gross would not be hearsay if Dr. Gross was the percipient witness thereto. The fact that petitioner told his own patient to call Dr. Gross may be inferred from the fact that the patient did call Dr. Gross. But, moreover, the finding of the reviewing agency need not rely alone on this reasonable inference but is corroborated by petitioner's own admission at the hearing.

This constituted substantial evidence in the form of the testimony of both Dr. Gross and petitioner proving the conduct of petitioner. As such, it was properly considered by the judicial review committee as the administrative body hearing the matter and the trial court discounted it in such a manner.[2]

 "[A] private hospital may not deprive a physician of staff privileges without granting him minimal due process of law protection." (*Ascherman*

---

proceedings irrespective of whether the matter is one of *initial* admission to the hospital or involves refusal to *readmit* (i.e., suspension of privileges of) a physician previously admitted. (*Unterthiner* v. *Desert Hospital Dist., supra,* 33 Cal.3d 285, see especially fn. 6 at p. 297; *Anton* v. *San Antonio Community Hosp., supra,* 132 Cal.App.3d 638.)

[2]While uncorroborated hearsay alone is insufficient to support an administrative finding, hearsay together with other reliable evidence may support a finding. (See *Walker* v. *City of San Gabriel* (1942) 20 Cal.2d 879 [129 P.2d 349, 142 A.L.R. 1383]; Gov. Code, § 11513, subd. (c); *Goldberg* v. *Barger* (1974) 37 Cal.App.3d 987 [112 Cal.Rptr. 827].)

v. *San Francisco Medical Society* (1974) 39 Cal.App.3d 623, 648 [114 Cal.Rptr. 681]; *Pinsker v. Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 551 [116 Cal.Rptr. 245, 526 P.2d 253].) However, "[t]he common law requirement of a fair procedure does not compel formal proceedings with all the embellishments of a court trial . . . nor adherence to a single mode of process. It may be satisfied by any one of a variety of procedures which afford a fair opportunity for an [affected party] to present his position." (*Pinsker, supra,* at p. 555.)

At bench petitioner was notified of the very hearing which he requested. He was informed of the reasons and purpose of the hearing, the names of the witnesses, and the specific charges against him. Petitioner was given and accepted the opportunity to present his case and to answer the charges. He himself testified he knew he was entitled to and did in fact cross-examine the several witnesses who appeared.

Petitioner presented to the trial court a petition wherein he claimed that he was not afforded the opportunity to exercise his right of immediate cross-examination and that his case, including such opportunity for cross-examination, was continued for several weeks. That claim is not supported by the record. Petitioner did in fact cross-examine the witnesses at the time they initially testified. There was some delay in getting copies of certain medical records into the hands of petitioner but this was a minor matter and petitioner did in fact have the copies and was able to use them before he testified at the continued hearing and before any decision was reached.

Considerations of fair play and fair treatment show that petitioner was fairly treated. Nevertheless, he sought and obtained a writ of mandate from the trial court. The issuance of the writ was based on a needless exaltation of formality over substance. It was without foundation because the formal procedure which petitioner claimed should have been followed under hospital bylaws was not required by these bylaws. At the time of the hearing before the judicial review committee, petitioner was specifically and carefully asked whether he had any objection to the hearing or to the procedures which brought the hearing about. There were only two objections which petitioner raised and other than those two, he expressly said he had no other objections.

Petitioner's first objection to the hearing was that he wished to be represented by a certain individual. That individual was a doctor who was also a lawyer. The bylaws, however, specifically provide that a lawyer may not appear on behalf of any party in the hearing process. Petitioner's second objection was that he did not want a particular doctor to sit on the judicial review committee because petitioner felt the doctor to be biased against him.

No true foundation was established by petitioner for this allegation. In fact, hospital had been careful to remove one doctor previously slated to be on the judicial review committee because that doctor had in fact been associated with reviewing the previous disciplining and correction of petitioner.

 In conclusion, it is important to remember that license suspension, revocation or other similar disciplinary proceedings involving licensees are not for the purpose of punishment but primarily to protect the public served by the licensee employed by a hospital. That same consideration is especially critical and applicable at bench when one considers the tremendously high degree of care and duty owed by a hospital to psychiatric patients. The resulting exposure to risk of lawsuits based on negligence of the staff, *Elam* v. *College Park Hospital* (1982) 132 Cal.App.3d 332 [183 Cal.Rptr. 156], modified in 133 Cal.App.3d 94a, compels the conclusion that a hospital should be free to establish high standards of professional work. "Community standards of medical practice, and whether particular type of conduct departs grossly from those standards, are 'legislative' facts. They inform the agency's judgment about what constitutes a violation of the Medical Practice Act." (*Franz* v. *Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 139, fn. 6 [181 Cal.Rptr. 732, 642 P.2d 792].) "[B]oards of hospital districts who are charged with regulating the admission of doctors to their hospitals must make legislative determinations." (*Unterthiner* v. *Desert Hospital Dist., supra,* 33 Cal.3d 285, 297.) These legislative determinations are not subject to second guessing review by a court exercising its independent judgment. So long as a fair hearing is provided, in disciplining or suspending those who do not meet its professional standards, the hospital should not be hampered by formalities not required by its bylaws nor by due process considerations. Fair hearing includes ample notice, opportunity to hear and cross-examine witnesses and to present evidence. All of this was afforded petitioner.

The judgment is reversed, the trial court is directed to vacate its judgment of June 26, 1981, ordering that a writ of mandamus issue and to affirm the findings of the judicial review committee.

Compton, Acting P. J., and Gates, J., concurred.